**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARY BERGMAN and ANDREW MERCATANTE, individually and on behalf of all others similarly situated, | ) ) ) ) Case No.: 1:21-cv-6315 |
| Plaintiffs, | ) ) Judge Sara Ellis ) Magistrate Judge M. David Weisman |
| v. | ) ) |
| GLANBIA PERFORMANCE NUTRITION, INC., | ) **JURY TRIAL DEMANDED** ) |
| Defendant. | ) ) |

<u>**FIRST AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs Mary Bergman and Andrew Mercatante (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Glanbia Performance Nutrition, Inc. d/b/a think! ("Defendant" or "Glanbia"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1. This is a putative class action lawsuit against Defendant for cheating consumers by uniformly advertising, marketing, and selling nutritional food products under the brand name "think!" (collectively, the "Products," enumerated below), each of which prominently features the representations "GMO FREE," "Non-GMO," or similar claims related to the absence of ingredients derived from genetically modified organisms ("GMO") (collectively, the "Non-GMO Claims"). However, contrary to Defendant's claims, each of the purportedly "Non-GMO"

Products does, in fact, contain ingredients that are derived from genetically modified food sources and therefore constitute GMOs.

2.    Defendant prominently labels every Product sold in the United States as "GMO Free" or "Non-GMO."  Defendant does this because consumers perceive all natural foods as better, healthier, and more wholesome.  Indeed, in recent years, consumers have become significantly more aware and sensitive to genetically modified organisms ("GMOs") in their food.  Many consumers want to avoid GMOs for a variety of reasons, including, but not limited to, the following: (1) health risks associated with ingesting foods derived from genetically modified ("GM") crops;[1] (2) concerns of the ingestion of pesticides and other toxins; (3) interest in promoting sustainable living and local farming; and (4) negative environmental effects associated with growing GM crops.  As a result, many consumers, including Plaintiffs, try to buy products that are not derived from GMOs, and a movement has developed demanding consumer products that are non-GMO products.  Thus, the market for all natural foods has grown rapidly in recent years, and Defendant seeks to take advantage of this trend through false advertising.

3.    But Defendant's Non-GMO Claims concerning the Products are false, misleading, and deceptive to consumers, who reasonably understand such claims to mean that a product was produced without genetic engineering and its ingredients are not derived from GMOs. Specifically, Plaintiffs and consumers reasonably understand Defendant's Non-GMO Claims to mean that Defendant's Products are 100% free of ingredients derived from GM crops or sourced from animals that have been raised on GMO feed.   Yet, contrary to Defendant's claims,

---

[1] GM crops such as canola, corn, and soy, are crops whose genetic material has been altered by humans using genetic engineering techniques.  The World Health Organization defines GMOs, which include GM crops, as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."  Accordingly, GM crops are not natural, but man-made.

Defendant's Products are in fact loaded with ingredients derived from GM crops such as corn, soy, and sugar beet, and many of Defendant's Products also contain protein and/or dairy sources derived from cows raised on GMO feed. Accordingly, Defendant's Non-GMO Claims are misleading and highly deceptive to reasonable consumers.

4.     At issue are the following products, which all contain the representation "Non-GMO" or "GMO Free" on the label and/or packaging: think! High Protein Bar, Chunky Peanut Butter; think! High Protein Bar, Lemon Delight; think! High Protein Bar, Creamy Peanut Butter; think! High Protein Bar, Brownie Crunch; think! High Protein Bar, Cookies and Crème; think! High Protein Bar, Berries & Crème; think! High Protein Bar, Chocolate & Crème Cupcake; think! High Protein Bar, Chocolate Fudge; think! High Protein Bar, Coconut Cake; think! High Protein Bar, White Chocolate Flavor; think! Protein+ 150 Calorie Bar, Chocolate Almond Brownie; think! Protein+ 150 Calorie Bar, Salted Caramel; think! Protein+ 150 Calorie Bar, S'mores; think! Protein+ 150 Calorie Bar, Cupcake Batter; think! Protein+ 150 Calorie Bar, Chunky Chocolate Peanut; think! Protein+ 150 Calorie Bar, Chocolate Chip; think! Keto Protein Bar, Chocolate Peanut Butter Pie; think! thinkKIDS Protein Bar, Chocolate Chip; think! thinkKIDS Protein Bar, Peanut Butter Cup; and think! thinkKIDS Protein Bar, Vanilla Cupcake (collectively, the "Products"). As noted above, each of these purportedly "GMO Free" Products contains GMOs.

5.     By prominently featuring the Non-GMO Claims on the labeling and/or packaging of its Products, Defendant intends to induce consumers to pay more than they would pay for other comparable products that are not falsely labeled with Non-GMO Claims, and consumers are so induced as a result of these claims. Thus, although (as discussed below) the Products have been a marketing sensation and an unmitigated financial success, Defendant's success has been the result of fraudulent, unlawful, and unfair business practices in the marketing and sale of the Products.

Defendant's misleading representations and unfair business practices described herein are plainly improper and unacceptable—particularly for a company that touts that "[t]he move towards 'clean and transparent' products means simpler labelling, a sustainable approach and reduced lists of ingredients will all be important into the future."[2]

6.      For the foregoing reasons, Plaintiffs bring this action individually and on behalf of similarly situated individuals against Defendant for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (ii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (iii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (iv) violation of New York's General Business Law § 349; (v) violation of New York's General Business Law § 350; (vi) breach of express warranty; (vii) breach of the implied warranty of merchantability; (viii) unjust enrichment / restitution; (ix) negligent misrepresentation; (x) fraud; and (xi) fraudulent misrepresentation.

## **THE PARTIES**

7.      Plaintiff Mary Bergman is a natural person and a citizen of California who resides in Scotts Valley, California.  At multiple points during and since 2020, Ms. Bergman purchased Glanbia's think!-branded Chunky Peanut Butter Bars and Lemon Bars from brick-and-mortar Safeway and CVS retail stores located in Scotts Valley.  Prior to her purchase, Ms. Bergman reviewed the labeling, packaging, and marketing materials of her Products and saw the false and misleading claims that, among other things, the Products are purportedly "GMO FREE" protein bars.  Ms. Bergman understood these claims to be representations and warranties by Glanbia that

---

[2] Glanbia, *Our Expertise: Performance and lifestyle brands*, https://www.glanbia.com/our-expertise/performance-and-lifestyle-brands (last accessed May 12, 2022).

the Products are free of all traces of GMOs, do not contain ingredients derived from GM crops, and do not contain animal-derived inputs sourced from livestock raised on GMO feed.  Ms. Bergman reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Glanbia's material misrepresentations and omissions, Ms. Bergman suffered, and continues to suffer, economic injuries.

8.     Plaintiff Andrew Mercatante is a natural person and a citizen of New York who resides in Pleasantville, New York.  In or around July 2021, Mr. Mercatante purchased Glanbia's think!-branded Chunky Peanut Butter Bars from a BJ's Warehouse Club located in New York. Prior to his purchase, Mr. Mercatante reviewed the labeling, packaging, and marketing materials of his Products and saw the false and misleading claims that, among other things, the Products are purportedly "GMO FREE" protein bars.  Mr. Mercatante  understood these claims to be representations and warranties by Glanbia that the Products are free of all traces of GMOs, do not contain ingredients derived from GM crops, and do not contain animal-derived inputs sourced from livestock raised on GMO feed.  Mr. Mercatante reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Glanbia material misrepresentations and omissions, Mr. Mercatante suffered, and continues to suffer, economic injuries.

9.     Plaintiffs Bergman and Mercatante (collectively, "Plaintiffs") continue to desire to purchase protein bars and other nutritional food items that are Non-GMO from Defendant.

However, Plaintiffs are unable to determine if the think! Products at issue here or any other of Defendant's products are actually made from ingredients that are indeed "Non-GMO" (*i.e.*, ingredients that do not derive from GM crops or animals raised on GMO feed). Plaintiffs understand that the composition of the Products may change over time. But, as long as Defendant may use the phrase "GMO Free" or "Non-GMO" to describe its Products that are not actually Non-GMO, then, when they are presented with false or misleading information when shopping, Plaintiffs will be unable to make informed decisions about whether to purchase Defendant's Products over a competitor's Products, and will be unable to evaluate the different options available in terms of their relative prices, or whether or how those prices may correlate with quality. Further, Plaintiffs are likely to be repeatedly misled by Defendant's false and/or misleading label claims for as long as Defendant's unlawful conduct described herein continues, and it will continue unless and until Defendant is compelled to either (a) ensure that Products marketed, labeled, packaged, and advertised as "GMO Free" are in fact free of GMOs, or (b) in the absence of a formula change, to cease and desist from claiming that the Products are "GMO Free" when they are not.

10.     Defendant Glanbia Performance Nutrition, Inc. d/b/a think! ("Defendant" or "Glanbia") is a foreign corporation with its domestic headquarters located at 3500 Lacey Road, Downers Grove, Illinois 60515. Relevant to Plaintiffs' claims herein, Glanbia is a leading global manufacturer, seller, and distributor of nutritional, lifestyle, and dietary supplements in a variety of forms, including powders, ready-to-eat bars and snack foods, and ready-to-drink beverages, under the brand name "think!." Glanbia has done business throughout New York, California, and the United States at all times during the Class Period. At all relevant times, Glanbia has advertised, marketed, manufactured, distributed, and/or sold (among other things) nutritional or dietary food

products and supplements, including the Products at issue, to consumers in and throughout New York, California, and the United States.  At all relevant times, Glanbia formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

11.     Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

13.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, and the acts and transactions giving rise to this action occurred in this District.

14.     This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District and because a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Background On Genetically Modified Organisms ("GMOs")**

15.      The World Health Organization defines genetically modified organisms ("GMOs") as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."[3]

16.      Genetic modification ("GM"), also called genetic engineering, biotechnology, or bioengineering, is the process scientists use to make GMOs.  It is an artificial laboratory-based technique that is specifically designed to enable the transfer of genes between unrelated or distantly related organisms.  It includes any process in which genetic material is artificially manipulated in a laboratory, and may involve creating combinations of plant, animal, bacteria, and virus genes that do not occur in nature or through traditional crossbreeding methods.  Genetic engineering also includes newer forms of biotechnology such as CRISPR, TALEN, RNAi, ODM, and gene drives. These techniques confer new properties or "traits" that are not naturally present in the organism. When incorporated into the DNA of an organism, genetically modified genes modify the functional characteristics – the traits – of an organism.

17.      GM crops, such as canola, corn, and soy, are crops whose genetic material has been altered by humans using genetic engineering techniques.  GM crops are not natural, but man-made. There are wide-ranging controversies related to GM crops, including health risks from ingesting GMOs and negative environmental effects associated with growing GM crops.

18.      As of 2021, approximately 93% of canola, 92% of corn, and 94% of soybeans

---

[3] World Health Organization (WHO), *20 questions on genetically modified foods* (2002), *available at* http://www.who.int/foodsafety/publications/biotech/20questions/en/index.html.

grown in the United States are genetically modified, as are 95% of sugar beets.[4]

  (a) **Corn** (Approx. 92% of U.S. crop is GMO) – Corn is genetically modified to be resistant to glyphosate or glufosinate herbicides.  Most GMO corn is used for human consumption.  In food products, GMO corn crop is used to produce corn flour, meal, oil, starch, modified food starch, corn gluten, corn syrup, and sweeteners such as fructose, dextrose, glucose and modified come from corn.  Genetically modified corn has been linked to health problems, including weight gain and organ disruption.

  (b) **Soybeans** (Approx. 94% of U.S. crop is GMO) – Soybeans are the most important crop worldwide for producing oil and protein.  Soybean and its processed derivatives are used in a multitude of food, groceries, supplements, and cosmetics.  Additionally, the remaining soy mass is used as protein-rich animal feed for fish, poultry, pigs, and beef.  Tolerance to herbicides is by far the most important commercial characteristic of GMO soybeans.  So, not only are soybeans a genetically engineered food crop, but farmers are also forced to use more and more pesticides to combat adaptive super bugs and super weeds, thereby creating additional health concerns for consumers.

  (c) **Sugar Beets** (Approx. 95% of U.S. crop) – Sugar Beets are genetically engineered to be RoundUp ready, like corn.  GMO sugar beets are used in refined sugar production, and the leftover fiber is used to feed animals at Concentrated Animal Feeding Operations

---

[4] *See* https://www.centerforfoodsafety.org/issues/311/ge-foods/about-ge-foods#:~:text=Center%20for%20Food%20Safety%20seeks,human%20health%20and%20the%20environment (last visited May 12, 2022); *see also* https://www.nestleusa.com/gmos/about-genetically-modified-crops-in-the-us#:~:text=Approximately%2093%20percent%20of%20the,is%20from%20genetically%20modified%20seed.&text=Corn%20is%20the%20most%20widely,is%20from%20genetically%20modified%20seeds (last visited May 12, 2022).

("CAFO").[5]

19.     Thus, any of the ingredients derived from domestically produced canola, corn, peas, rice, soybeans, or sugar beets are highly likely to contain GMOs, notwithstanding Defendant's Non-GMO Claims or similar product label representations to the contrary.

**B.     "Non-GMO" Is A Highly Profitable Descriptor**

20.     Product packaging is a significant vehicle through which the purveyors of natural and organic food products communicate material that they believe, and reasonably expect, to be important to consumers in making purchasing decisions.

21.     The health food market is no longer a niche market.  Consumers have been increasingly health conscious since the 1970s.  They seek out and covet food products that are natural and healthy and look for labels that convey these qualities in the foods they choose to purchase.  According to *Natural Foods Merchandiser*, a leading information provider for the natural, organic, and health food industry, the natural food industry enjoyed over $166 billion in revenue in 2019.  This means that since 2010, the natural food industry has more than doubled in size since it hit $81 billion in 2010.  Consumer demand for non-GMO foods is expected to rapidly increase into the next decade as well.

22.     The designation "non-GMO" appeals to consumers for its health attributes.  This designation also appeals to reasonable consumers' interest in protecting the environment, promoting sustainable living and local farming, and minimizing people's and the Earth's exposure to pesticides and other toxins.

---

[5] *See GMO 101, A Practical Guide: Potential Sources of Genetically Engineered Ingredients in Food*, at 244; *id.* ("Anything not listed as 100% cane sugar is suspect.  Look for organic and non-GMO sweeteners, candy and chocolate products made with 100% cane sugar, evaporated cane juice or organic sugar, to avoid GM beet sugar.").

23.     Any doubt about the money generating power of natural and healthy foods is dispelled by the entry and success of large conglomerates in the health food market.  For example, the well-known *Kashi* brand is owned by *Kellogg*, while *PepsiCo* has recently acquired the natural food company, *Be&Cheery*, for $705 million.  Additionally, the *Odwalla* brand has flourished and expanded significantly since its purchase by the *Coca-Cola Company* in 2001 for $181 million.

24.     Defendant has acknowledged that, "[i]n today's world, consumers are seeking brands and ingredients that focus on healthy lifestyles."[6]  Thus, Glanbia has marketed its "portfolio of brands and ingredients [to] play into these trends[ and] support [its] future ambitions."[7]

25.     Indeed, a consumer survey confirms that consumers are willing to pay more for a product that is labeled "Non-GMO" versus a similar product that does not contain that label.  Plaintiffs' counsel conducted a nationwide survey of just over 400 adult grocery shoppers.[8]  The

---

[6] *See* Glanbia Annual Report and Financial Statements 2020, at 11, *available for download at* https://www.glanbia.com/annualreport2020; *see also id.* at 8 ("'Our brands are at the heart of healthy lifestyles and aim to transform people's health and wellbeing.'") (quoting Glanbia CEO Hugh McGuire); *id.* at 9 ("We have strong brands and market positions  * Glanbia understands the value of great brands and ingredients.  * Glanbia Performance Nutrition's (GPN's) portfolio of world-leading performance and lifestyle nutirion [sic] brands satisfies a range of consumer motivations from sports performance to weight management.").

[7] *Id.*; *see also* https://www.glanbia.com/about/our-business/glanbia-performance-nutrition ("The growing global interest in healthy, active lifestyles means our portfolio appeals to a variety of sports performance, active and healthy-lifestyle consumers with a wide range of fitness motivations.") (last accessed May 12, 2022).

[8] The survey included 402 participants over the age of 18, 195 of whom were male, 202 of whom were female, and 5 of whom were non-binary.  Some 57.7 percent of the participants were from the following states, with a minimum of 3% (15 participants) each: California, Florida, Illinois, New York, Ohio, and Texas.  The remaining 42.3 percent with a minimum of one participant each, were from the following states: Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Georgia, Hawaii, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

vast majority (approximately 78.4%) answered that they are willing to pay more for a product labeled "Non-GMO" versus a product that does not contain that label.[9]

### C. Consumers' Understanding of GMOs and Non-GMO Claims

26.     While the abbreviated term "GMO" may generally refer to genetically modified organisms, when used in food marketing and labeling, terms like "non-GMO" and "GMO free" (which are reasonably understood by consumers to be synonymous[10]) have a broader meaning to consumers in that they convey food products that do not contain and are not sourced or derived from genetically engineered foods and methods, such as genetically engineered corn that ends up in corn syrup and beef from a cow that was raised on a diet of genetically engineered or modified food. Consumers have this understanding because of educational efforts by "non-GMO" consumer information sources and certification agencies as well as government authorities.  The successful

---

[9] The question in the survey was as follows: "Are you willing to pay more for a product that is labeled 'Non-GMO' versus a similar product which does not contain that label?"  The response choices provided were Yes and No.

[10] In November 2015, the Food and Drug Administration ("FDA") issued guidelines on the labeling of foods derived from genetically engineered plants and grouped the terms "*GMO free*," *GE free*," "*does not contain GMOs*," "*non-GMO*" "*and similar claims*" together.  U.S. Food and Drug Administration, *Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Derived from Genetically Engineered Plants* (Mar. 2019), *available at* http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/ucm0590 98.htm#references (emphasis in original).  The FDA also warned that the term "free" that is associated with these similar claims "conveys zero or total absence" of ingredients derived through biotechnology and that these type of claims are "problematic" due to the challenges of substantiating such claims.  *Id*.  Thus, the FDA took care to appropriately group these commonly used "non-GMO" related labeling terms in the same fashion consumers do, demonstrating that "non-GMO," "does not contain GMOs," and "GMO free" have an identical and synonymous meaning to consumers.  The FDA also points out that the while the "O" in the acronym GMO generally refers to the word "organism" because an entire organism is generally not contained in a food (microorganisms in the dairy product yogurt being a cited exception), GMO is generally "read as meaning that the food was not *derived from* a genetically modified organism, such as a plant that has been genetically engineered."  *Id*. (emphasis in original).

results of their efforts to develop a consumer understanding of "non-GMO" and related terms in this manner are demonstrated by market research surveys as discussed below.

27.     The Non-GMO Project, for example, serves as one of the leading educational providers for consumers given its unique status as North America's "only third party verification and labeling for non-GMO food and products."  In response to increased use of GMOs, the Non-GMO Project was formed in the early 2000s with the goal of "creating a standardized meaning of non-GMO for the North American food industry."  Because of the Non-GMO Project's work with companies and food producers, through its Independent Verification Program, its Non-GMO Project Verified seal is now found on over 50,000 food products and with 3,000 participating brands.[11]  Further, it makes significant educational outreach efforts through its Non-GMO Project and LivingNonGMO.org websites.  Combined, these websites are host to over 200 million visits a year.  Consumers thus readily and understandably associate the terms "GMO", "non-GMO," and similar marketing claims, consistently with definitions set by the Non-GMO Project.

28.     Accordingly, consumers understand that any product or ingredient that is contaminated by or with GMOs is not "non-GMO."  And, the Non-GMO Project specifically extends its definition of "Non-GMO or No-GM" to any "plant, animal, or other organism whose genetic structure has not been altered by gene splicing" *and* to "a process or product that does not employ GM processes or inputs."[12]  Per the consumers' leading industry source, the Non-GMO Project states that "animal feed commonly contains High-Risk Inputs" in the form of genetically modified or engineered feed.  As a result, animal food products (such as meat, poultry, and dairy)

---

[11] *See* The Non-GMO Project, *Verification FAQs*, https://www.nongmoproject.org/product-verification/verification-faqs/ (last accessed May 12, 2022).

[12] The Non-GMO Project, *Non-GMO Project Standard* (Dec. 30, 2020), at 24, *available at* https://www.nongmoproject.org/wp-content/uploads/Non-GMO-Project-Standard-Version-16.pdf (last accessed May 12, 2022).

are included on the Non-GMO Project's list of High-Risk ingredients. For animal products to be properly labeled as "non-GMO," they must meet a number of stringent requirements, including that the animals and poultry be fed seed that is less than 5% GMO for various periods of the animal's life (including the entire life for meat animals other than poultry). Other GMO awareness campaigns similarly advise consumers that, to avoid GMOs, they should avoid the following "[s]ources of GMOs": "[m]eat, eggs, and dairy products from animals that have eaten GMO feed"[13]; "[d]airy products from cows injected with the GMO hormone rbGH"[14]; "[f]ood additives, enzymes, flavorings, and processing agents, ranging from the sweetener aspartame (NutraSweet) to the rennet used to make cheese (if the dairy animals were fed GMO feed)"[15]; and "[h]oney and bee pollen from bees that have foraged on nearby GM crops[.]"[16] Such campaigns thus further the consumer understanding that "non-GMO" and related marketing, labeling, and advertising claims indicate to consumers that any animal-derived inputs contained in a food product was not raised on genetically modified feed.

29. The federal government has also taken steps to adopt standards that assist companies and consumers with understanding that "non-GMO" labeling means that any animal-derived inputs contained in food products with such a label are sourced from animals that were not raised on GMO feed. For example, in mid-2013, the U.S. Department of Agricultures' Food Safety and Inspection Service, tasked with regulating the safety and proper labeling of meat, poultry, and egg products, approved the Non-GMO Project Verified label claim for meat and liquid egg

---

[13] GMO Awareness, *Overview*, https://gmo-awareness.com/avoid-list/overview/ (last accessed May 12, 2022) (explaining that "the primary use of GMO corn and soy is to feed U.S. meat animals").

[14] *Id*.

[15] *Id*.

[16] *Id*.

products.[17]  These government efforts are intended to inform consumers that any such animal-derived inputs come from animals that were not raised on a diet consisting of GMO ingredients, such as GM crops like corn, soy, and alfalfa.  Accordingly, consumers understandably associate advertising or labeling with the terms "non-GMO," "GMO free," or the like, with products containing ingredients that have not been tainted by GMOs, that do not derive from GM crops, and that do not contain animal-derived inputs raised on GMO feed.

30.     Market research also supports the fact that consumers understand and expect that advertisements and labeling of "non-GMO," "GMO free," or related claims have similar meanings and would not apply to foods sourced from animals raised on GMO feed.  For example, a poll of Ohio voters by Public Policy Polling in December 2015 indicated that 76% of consumers would "[e]xpect that a dairy product labeled as 'non-GMO' was made using milk from cows that had not been fed any genetically modified feed."[18]  Only 11% of respondents would not expect such a product to come from cows fed only with non-GMO feed.[19]  As these poll results indicate, "consumer awareness of GMOs is almost universal at 97%."[20]

31.     Indeed, a consumer survey confirms that for products labeled Non-GMO, consumers would not expect it to contain byproducts from animals fed with genetically modified

---

[17] *See* Food Liability Law, *USDA Approves Non-GMO Label Claim for Meat and Egg Products* (Jul. 11, 2013), http://www.foodliabilitylaw.com/2013/07/articles/legislation-and-regulation/food-labeling/usda-approves-non-gmo-label-claim-for-meat-and-egg-products/.

[18] *See* The Mellman Group, "Nearly All Voters Continue to Want GMO Foods Labeled," (Nov. 23, 2015) http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed May 12, 2022).

[19] *See also* Center for Food Safety, *U.S. Polls On GE Food Labeling* (listing other relevant surveys regard GMO food labeling and consumer preferences).

[20] "Consumer Awareness of GMOs Continues to Soar,"  Non-GMO Project (Aug. 7, 2018), https://www.nongmoproject.org/blog/consumer-awareness-of-gmos-continues-to-soar/ (last accessed May 12, 2022).

feed.  As noted above, Plaintiffs' counsel conducted a nationwide survey of just over 400 adult grocery shoppers.  The majority of consumers (approximately 63.2%) answered that they would not expect a product labeled Non-GMO to contain byproducts from animals fed with genetically modified feed.[21]

32.     Thus, consumers reasonably understand food advertised or labeled as "non-GMO," "GMO free," "does not contain GMOs," or other similar claims only apply to food that: (1) does not contain any ingredients derived from GM crops; and (2) does not contain animal byproducts such as meat, poultry, pork and dairy that were raised on a diet of GMO feed.  Consumers also understand that the term "food" applies broadly to food *and* drink, which is also how the FDA defines it.  21 U.S.C. § 321(f)(1).

### D.     Consumers Perceive GMOs As Negative And Unhealthy

33.     Today, genetically modified crops are used in biological and medical research, production of pharmaceutical drugs, experimental medicine, and agriculture.  Such crops are engineered to, among other things, resist certain pests, diseases, or environmental conditions, reduce spoilage, increase size and yield, taste and look better, and resist chemical treatments.  In the United States, 94% of the planted area of soybeans, 95% of cotton, and 92% of corn are genetically modified varieties.[22]

34.     Since 1996, farmers in animal agriculture (including poultry) have optimized GMOs by feeding genetically modified grains (corn) and oilseeds (soybean) to their flocks and

---

[21] The question in the survey was as follows: "For a product labeled Non-GMO, would you expect it to contain byproducts from animals fed with genetically modified feed?"  The response choices provided were Yes and No.

[22] United States Department of Agriculture Economic Research Service, *Adoption of Genetically Engineered Crops in the U.S.*(July 9, 2015), http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us.aspx.

herds.[23]  Because more than 90% of the corn and soybeans in the United States are raised from genetically modified seeds, almost all corn and soybean used in conventional livestock and poultry feed is genetically modified.  In addition, other genetically modified crops such as cotton, canola, sugar beets, and alfalfa are commonly used in animal feed.[24]  Consequently, most meat and dairy products are contaminated with GMOs due to the feed consumed by livestock and poultry and cannot be labeled as "non-GMO" without deceiving consumers.  Because the safety or health impact of food and other goods derived from genetically modified crops has been and continues to be hotly debated[25], it is no surprise that according to a Pew Research Center survey, only 37% of the general public believes that "it is generally safe to eat genetically modified (GM) foods."[26]

35.     While the potential environmental and health impact of GMOs has been the subject of much scrutiny and debate within the food and science industries,[27] Defendant and other

---

[23] *See* National Chicken Council, *Genetically Modified Organism (GMO) Use in the Chicken Industry* (July 5, 2013), http://www.nationalchickencouncil.org/genetically-modified-organism-gmo-use-in-the-chicken-industry/.

[24] *See* GMO Inside Blog, *How Pervasive are GMOs in Animal Feed?* (July 16, 2013), http://gmoinside.org/gmos-in-animal-feed/.

[25] *Compare, e.g.*, European Commission, *A Decade of EU-funded GMO Research* (2001-2010), http://ec.europa.eu/research/biosociety/pdf/a_decade_of_eu-funded_gmo_research.pdf (last accessed Mar. 11, 2016), *with* Non GMO Project, *GMO Facts*, http://www.nongmoproject.org/learn-more/ (last accessed Mar. 11, 2016) ("Meanwhile, a growing body of evidence connects GMOs with health problems, environmental damage and violation of farmers' and consumers' rights.").

[26] Pew Research Center, *Public and Scientists' Views on Science and Society* (Jan. 29, 2015), https://www.pewresearch.org/science/2015/01/29/public-and-scientists-views-on-science-and-society/ (last visited May 12, 2022).

[27] For example, the Institute for Responsible Technology—"a world leader in educating the public and change-makers about the health risks associated with the use of GMOs, including the growth of pre-cancerous cells, stomach lesions, changes in blood cells, and liver and kidneys in the animals studied.  The Institute has also identified several other issues, such as skin and intestinal reactions. See The Institute for Responsible Technology, 65 Health Risks of GM Foods, available at https://www.responsibletechnology.org/gmo-dangers/65-health-risks-of-gm-foods/ (last accessed May 12, 2022).

businesses know customers attach an unhealthy, negative perception towards them.[28]  Defendant's Non-GMO Claims are specifically intended to manipulate consumers into avoiding GMOs, including food products containing ingredients derived from animals raised on GMO feed, because of health and environmental concerns.

36.     As a result of the GMO-related controversy and consumer concerns, companies have created an $11 billion (and fast growing) market for non-GMO products and consumers are willing to pay the higher costs associated with non-GMO products due to the negative perception of genetically modified foods and because GMO-free ingredients are often more expensive.[29]  And, there is no dispute that GMO labeling is a material and important issue to consumers.  In a November 2015 poll, 89% of likely voters in 2016 would support labeling of GMO foods.  And, 77% percent of those "strongly favored" such a requirement.  These poll results clearly show that Americans want to know if the food they are purchasing are non-GMO.  Thus, there is no dispute that GMO labeling is a material and important issue to consumers.[30]

---

[28] *See, e.g., Frequently Asked Questions*, https://thinkproducts.com/en-us/faqs/; https://thinkproducts.com/en-us/nutritional-info/ ("What is your philosophy on non-GMO ingredients?  * At thinkThin®, we recognize and support consumer demand for non-GMO ingredients.") (emphasis added); *see also id.* (noting that "thinkThin® is committed to sourcing ingredients that are not genetically engineered" and claiming its "bars contain 100% non-GMO ingredients"); *Nutritional Benefits*, https://thinkproducts.com/en-us/nutritional-info/ ("thinkThin® is committed to sourcing ingredients that are not genetically engineered[.]").

[29] *See* Gluten Free Living, *GMO Free Comes at a Price, Gluten-Free Living* (Nov. 25, 2014), http://www.glutenfreeliving.com/gluten-free-lifestyle/non-gmo/gmo-free-comes-at-price/; The Mellman Group, Inc., *Voters Want GMO Food Labels Printed On Packaging*, http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed May 12, 2022).

[30] The Mellman Group, Inc., *Voters Want GMO Food Labels Printed On Packaging*, http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed May 12, 2022).

### E. Defendant's False, Misleading, And Deceptive Non-GMO Claims

37.     The think!™ brand (formerly, "thinkThin") was launched in 2019.[31]  Prior to the 2019 re-brand, in 2015, Glanbia acquired thinkThin and its twelve product lines for $217 million from ThinkThin LLC.  Glanbia saw the acquisition as a good "fit within its Global Performance Nutrition (GPN) portfolio," as it was slated to "increase Glanbia's presence in the nutrition bar category, valued at $2.8bn in US retail."[32]

38.     think! was originally founded as thinkThin in 1999 by Lisanne Falsetto with the stated aim of providing nutritious food that supports wellness.  From their inception, the Products were advertised and marketed as healthy food products with clean ingredients.  With sales of almost $100 million annually, think! products are distributed nationwide through major retailers, such as Walmart, Target, Amazon, and its own official website at https://www.thinkproducts.com.

39.     In or around 2013, think! seized upon the anti-GMO zeitgeist and launched a multi-media publicity and advertising campaign touting several think! products as free from GMOs and GMO derived foods.[33]  The announcement marked the beginning of Defendant's declared focus on supposedly ridding its Products of GMOs.  Among other things, Defendant claimed it was

---

[31] Glanbia Annual Report and Financial Statements for FY 2020, at 46, *available for download at* https://www.glanbia.com/investors/annual-reports.

[32] Irish Farmers Journal, *Glanbia confirms acquisition of thinkThin* (Dec. 11, 2015), https://www.farmersjournal.ie/glanbia-confirms-acquisition-of-thinkthin-195967.

[33] *See* The New York Times, *Seeking Food Ingredients That Aren't Gene-Altered* (May 26, 2013), https://www.nytimes.com/2013/05/27/business/food-companies-seeking-ingredients-that-arent-gene-altered.html ("Pressure is growing to label products made from genetically modified organisms, or 'G.M.O.' … And so, for many businesses, the pressing concern is just what it will take to gain certification as non-G.M.O.  * Lizanne Falsetto[, founder and then-CEO of thinkThin, became interested in marketing products as GMO free] two years ago … [when h]er largest buyer, Whole Foods Market, wanted more products without genetically engineered ingredients — and her bars had them.  Ms. Falsetto did not know how difficult it would be to acquire non-G.M.O. ingredients. … Finally, last month, the company began selling Crunch bars certified as non-G.M.O.") (emphasis added).

"committed to sourcing ingredients that are not genetically engineered" and that its "bars contain 100% non-GMO ingredients[.]"[34]  By 2015, Non-GMO Claims were featured on the labeling and/or packaging of the Products at issue.

40.     As indicated above, Defendant has engaged in a multi-media mass marketing and advertising campaign to inform consumers that it was going "non-GMO" since approximately 2015, through various methods including claims on its website, social media, in-store signage at the brick-and-mortar retail locations where its Products are sold, and – most importantly – prominent Non-GMO Claims affixed to the labeling and/or packaging of its Products.

41.     These efforts, including Defendant's prominent use of Non-GMO Claims on its product labels, are intended to further Defendant's healthy lifestyle image as part of its broader goal to differentiate itself from its nutritional food product competitors and/or other protein bar manufacturers, thereby increasing its share of the booming health foods market and, correspondingly, the revenues it derives from that market.  That is, Defendant's move to becoming "non-GMO" was a strategic marketing campaign to entice new health-minded consumers and to retain current ones:[35]

_____

[34] *See* think! "Frequently Asked Questions," https://thinkproducts.com/en-us/faqs/ (last visited May 12, 2022); *see also*, think! "Nutritional Benefits," https://thinkproducts.com/en-us/nutritional-info/ (last visited May 12, 2022).

[35] *See, e.g.*, https://thinkproducts.com/en-us/think-promise/ ("At think!, we provide quality ingredients without sacrificing taste. That's the thinkPROMISE™."); *id*. ("THOUGHTFUL INGREDIENTS  * We packed our products with thoughtfully delicious ingredients to help fuel your day. Because when you give your body what it needs, along with a healthy, active lifestyle, it gives you the strength to help you do the things you love."); *id*. ("Our products are made with exceptional ingredients and protein made from whey or soy that is not bioengineered.").



# think!

*We believe when you give your body what it needs, it gives you back the strength to do the things that you love. And good nutrition should always be delicious. That's why think!® products are packed with protein and come in a variety of decadent flavors.*

**Our Protein Bars are always 🔺 Protein**

**• Gluten Free   • GMO Free   • Kosher   • No artificial flavors or sweeteners***

*See* think! Website, "Protein Bar Portfolio."[36]

## Company Overview

**think!** is focused on developing delicious, protein-rich portable foods that support a healthy approach to nutrition and wellness for every lifestyle need.

HIGH PROTEIN • PLANT BASED • KETO FRIENDLY • LOWER CALORIE • KID FRIENDLY

## Not all protein bars are created equal

### Choose a Better Nutrition Bar!

*Bars are a convenient snack option, especially when you're on the go. However, some can be high in sugar, sodium, and calories without offering much of a nutritional benefit. Follow this bar road map to choose a better bar!*

*See* think! Website, "Company & Key Nutritional Tenets."[37]

42.     Defendant's nationwide marketing campaign supporting its Non-GMO Claims for its Products has been extensive and comprehensive throughout the Class Period.  Defendant's Non-GMO Claims have been a resounding success for the company, which has  "enjoy[ed] strong growth year on year" since the Non-GMO Claims were added to think! Product labels in or around

---

[36] *Available at* https://thinkproducts.com/wp-content/uploads/2020/05/think_BarHandout.pdf.

[37] *Available at* https://thinkproducts.com/wp-content/uploads/2020/05/Company-Key-Nutritional-Tenets-2020-05.pdf.

2015. "For the 12 months to the end of September 2015, thinkThin generated sales of $84m (€78m), reflecting a compound average growth rate for the previous three years of 31%."[38]  By July 2017, then-CEO Michele Kessler reported that think! "was growing shipments in the double digits and was 'outpacing the [protein bar] category.'"[39]  In FY 2020, Defendant showed strong growth in eCommerce channels, with think!™ "outperform[ing] the category performance in the year[.]"[40]  The think! brand also delivered strong revenue growth in the first half of 2021 "due to improved consumer trends."[41]  Yet, although Defendant told consumers its Products were "GMO Free," as discussed below, the opposite was true.

F.     **Defendant's Products Contain Genetically Modified Ingredients Despite Being Marketed As "GMO Free"**

43.     All of the think! Products at issue are substantially similar.  All varieties are manufactured in-house at Defendant's headquarters located in North America.  Moreover, the labels of all of the think! Products are substantially similar in that each Product contains a Non-GMO Claim featured prominently on the front of the Product's labeling and/or packaging. However, Defendant's Non-GMO claims are deceptive and misleading to reasonable consumers because: (1) Defendant's Products are in fact loaded with ingredients derived from GM crops; and (2) Defendant's Products also contain protein and/or dairy sources derived from animals raised on

---

[38] Lorcan Allen, "Glanbia confirms acquisition of thinkThin*." Irish Farmers Journal* (Dec. 11, 2015), https://www.farmersjournal.ie/glanbia-confirms-acquisition-of-thinkthin-195967 (last visited May 12, 2022).

[39] Elaine Watson,  "thinkThin continues double-digit growth, prepares to unveil 'breakthrough protein snack'*" Food Navigator USA* (Jul. 17, 2017), https://www.foodnavigator-usa.com/Article/2017/07/17/thinkThin-posts-strong-growth-plans-breakthrough-protein-snack# (last accessed May 12, 2022)

[40] *Id.*

[41] Glanbia Connect, "Glanbia delivers strong first half 2021, ahead of expectations" (Aug. 12, 2021), https://www.glanbiaconnect.com/news/glanbia-delivers-strong-first-half-2021-ahead-of-expectations (last May 12, 2022).

GMO feed. Even worse, none of the product labels expressly state that the Products contain GMOs, and Defendant does not adequately disclose any of this information to consumers on its Product labels or on its website. Thus, the misrepresentations also result in identical injuries.

(a)      Defendant's Products Are Not Non-GMO Because They Contain Ingredients Derived From Animals Raised On GMO Feed:  As set forth above, consumers understand  the  terms "non-GMO," "GMO free," and similar representations, to apply only to ingredients that do not come from animals fed with genetically engineered or GMO derived feed. Defendant deceptively advertises, labels, and markets its Products as "Non-GMO" or "GMO free" even though *each* of the Products at issue in this case contains whey-based protein sources (among other dairy- and animal-based ingredients) – including whey protein isolate, whey protein concentrate, cultured whey protein concentrate, etc. – derived from animals (most commonly, cows) that are fed with a genetically engineered or GMO-derived feed. Additionally, many Products also contain other dairy-based ingredients derived from cows raised on GMO feed, such as milk, nonfat dry milk, cultured nonfat dry milk, milk protein isolate, milk protein concentrate, whole milk, cultured skim milk, butterfat, and calcium caseinate.[42]

(b)      Defendant's Products Contain Ingredients Derived From GM crops And Therefore Are Not Non-GMO: As detailed below, Defendant's Products contain numerous ingredients derived from GM crops.  For instance, *each* of Defendant's Products contains soy

---

[42] *See* "Frequently Asked Questions," https://thinkproducts.com/en-us/faqs/ (noting that its whey proteins derive from cows raised on feed derived from GMO corn: "[The non-GMO project] requires that dairy cows not consume any genetically modified corn, … [and because it contains whey protein], our Lean Protein & Fiber product is not NGP-verified") (last visited May 12, 2022); *see also id*. ("[T]he non-GMO project does not recognize the dairy proteins used in our bars as NGP verifiable.").

protein isolate, an ingredient derived from GMO soybean.  Most of Defendant's Products also contain ingredients derived from GMO soybean and sugar beets.

44.     Defendant's Products contain, without limitation, one or more of the following GMO ingredients:

•     **Assorted Dairy Ingredients and Products** (including butterfat, casein, calcium caseinate, cultured nonfat dry milk, cultured skim milk, milk protein isolate, milk protein concentrate, nonfat dry milk, whey proteins, whole milk, etc.).  The United States currently devotes nearly 75 million acres of land to the production of soybeans, most of which are fed to animals. Similarly, much of the nation's 80 to 90 million acres of corn is fed to livestock.  Since 85 to 95% of these crops are GMO, it is safe to assume – unless provided proper certification – that "normal" dairy products contain GMO ingredients in one form or another.  Thus, unless a product is USDA Certified Organic or has a Project Non-GMO Verified seal, "ALL dairy products can be assumed to come from commercial/industrial dairy sources (CAFO - concentrated animal feeding operations) whose cows are typically fed GM-corn, cottonseed, alfalfa[,] or soybean feed."[43]

---

[43] *See* Chef Alain Braux, *GMO 101, A Practical Guide: Potential Sources of Genetically Engineered Ingredients in Food*, at 184, *available at* https://play.google.com/books/reader?id=YeHXBQAAQBAJ&pg=GBS.PA2&hl=en.  As Chef Alain Braux, award-winning executive chef and multiple award-winning food and health author, further explained:

> The United States currently devotes nearly 75 million acres of land to the production of soybeans, most of which are fed to animals.  Similarly, much of the nation's 80 to 90 million acres of corn is fed to livestock.  Since 85 to 95% of these crops are GMO, it is safe to assume – unless provided proper certification – that "normal" dairy products contain GMO ingredients in one form or another.

> In the United States more than 99% of farm animals come from factory farming. Conventional cattle grown in [concentrated animal feeding operations ('CAFOs')] is fed what is called concentrated feed.  It can mean any number of things, but the base food is always a grain slurry, typically of GMO corn and corn byproducts, GMO soy and soy hulls, and other grains and cereals.  CAFO nutritionists sometimes also include GM cotton byproducts and GM sugar beets in their cows' diet.

Indeed, these ingredients are also identified as genetically modified ingredients by the Institute for Responsible Technology.[44]

- **Casein.** Casein is the name given to a larger group of proteins known as phosphoproteins, which represent as much as 80 percent of the proteins in cows' milk. As a dairy product, this ingredient is included on The Institute for Responsible Technology's list of GMO Ingredients.[45] It is a white, tasteless, odorless protein precipitated from dairy milk by rennin. It is the basis of cheese and is used to make plastics, adhesives, paints, and foods. All dairy products from bovines, and the vast majority of these animals (including the cows from which the casein in Defendant's Products was derived[46]) are fed corn, soy, or cotton feed (all GM crops).

- **Calcium Caseinate.** Calcium caseinate is a protein derived from the casein in milk, which is, in turn, derived from cows raised on GMO feed. As a dairy product, this ingredient is included on The Institute for Responsible Technology's list of GMO Ingredients.[47] Manufacturers produce calcium caseinate by changing the pH of cow's milk to neutral or acidic. In this state, casein becomes insoluble in water; this allows manufacturers to isolate it from the other proteins in milk. After this separation, manufacturers combine casein with calcium hydroxide at high alkaline levels and dry the protein. Thus, while casein is natural, calcium

---

*Id.* (emphasis added).

[44] The Institute for Responsible Technology, "Non-GMO Shopping Guide," https://www.pilgrimsmarket.com/pdf/Non-GMO-Shopping-Guide.pdf (last accessed May 12, 2022).

[45] *See supra* n. 43 at 14.

[46] *See* Frequently Asked Questions, https://thinkproducts.com/en-us/faqs/ (noting that its whey proteins derive from cows raised on feed derived from GMO corn) (last visited Oct. 28, 2021).

[47] *See supra* n. 43 at 14.

caseinate is a synthetic additive.  It is commonly used as a food additive in nutritional food, and it also acts as an emulsifier, thickener or stabilizer.[48]

- **Citric Acid.**  Citric acid was the first additive that was produced on a large scale biotechnically.  Most citric acid found in food is a commodity chemical produced by feeding simple carbohydrates to *Aspergillus niger* mold and then processing the resulting fermented compound.  Citric acid-producing microorganisms grow on culture media that usually contain molasses (which is derived from sugar beet, a GMO crop) and/or glucose (which usually comes from corn, another GMO crop).  Calcium hydroxide and sulfuric acid are often used in processing.[49]  This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[50]

- **Cultured Dairy Products** are a world-wide assortment of dairy foods that have been fermented with lactic acid bacteria such as *Lactobacillus*, *Lactococcus*, and *Leuconostoc*. As a dairy product, this ingredient is included on The Institute for Responsible Technology's list of GMO Ingredients.[51]

- **Erythritol.**  Erythritol is a sugar alcohol used as a food additive and sugar substitute.  "Erythritol is widely promoted as a natural sweetener for being found in nature, but it

---

[48] *See* FoodAdditives.net, *What is Calcium Caseinate in Food and Uses: A Protein and Calcium supplement* (Jan. 6, 2020), https://foodadditives.net/emulsifiers/calcium-caseinate/ (last visited Oct. 28, 2021); *see also* Rafael Jimenez-Flores, *Genetic Engineering of the Caseins to Modify the Behavior of Milk During Processing: A Review*, 71 J. Dairy Sci. (1988), 2640, https://www.journalofdairyscience.org/article/S0022-0302(88)79857-4/pdf.

[49] *See* Chef Alain Braux, *GMO 101, A Practical Guide*, 103 (2014); *see also* New Hope Network, *Is citric acid natural* (Dec. 19, 2004), *available at* https://www.newhope.com/ingredients-general/is-citric-acid-natural (last visited Oct. 28, 2021).

[50] *See supra* n. 43 at 14.

[51] *See supra* n. 43 at 14.

is, in fact, a synthetic sweetener."[52]  "Erythritol is *not directly* isolated or extracted from a plant."[53] It is obtained through processes that chemically change or break down components of the starting material, GMO corn.  Specifically, erythritol is made by processing genetically modified corn using enzymes and fermentation.[54]  This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[55]

- **Maltitol.**  Maltitol is a sugar alcohol-based artificial sweetener that "is

---

[52] Notably, although "[e]rythritol is a sugar alcohol naturally found in small amounts in some fruits and fermented foods[,] … [t]he erythritol used today is produced by fermenting corn … using the fungi *Moniliella pollinis* or *Trichosporonoides megachliensis*." Wellness Mama, *Erythritol: Is This Artificial Sweetener a Health Alternative to Sugar?* (May 20, 2020), *available at* https://wellnessmama.com/155432/erythritol-safety/ (last visited May 12, 2022).

*See also* Get Healthy Blog, *Erythritol: The Good, The Bad & The Ugly With This Common Sweetener* (Oct. 12, 2016), *available at* https://getcollagen.co.za/erythritol-the-good-the-bad-the-ugly-with-this-common-sweetener/ (last visited May 12, 2022) ("[Erythritol] naturally occurs in some fruits and fermented foods, but the variety being added to food and beverages today is typically man-made from GMO cornstarch, resulting in an ultra-processed food — very far from a natural sweetening agent.  It's one of those "invisible GMO ingredients.") (emphasis added); *see also* https://www.whatsugar.com/post/is-erythritol-natural-or-artificial ("[N]one of the natural sources are used to produce the store-bought erythritol. … The store-bought erythritol is made from corn[.] … Those sources are used because they produce erythritol more economically[.]") (emphasis added); https://foodbabe.com/stevia-good-or-bad/ ("[E]rythritol is a naturally occurring sugar that is sometimes found in fruit, but food manufacturers don't actually use the natural stuff.  Instead they start with genetically engineered corn and then go through a complex fermentation process to come up with chemically pure erythritol.") (emphasis added).

[53] What Sugar Blog, *Sweetener Review: Erythritol | Is it Really "Natural" and The Perfect Sweetener?* (May 20, 2020), https://www.whatsugar.com/post/is-erythritol-natural-or-artificial (last visited May 12, 2022).

[54] *See id*. (noting that "erythritol is made from corn" and that the "production process starts by converting [corn] into a sugar (glucose or fructose) and then to erythritol"); *see also* Redefined, *The Truth on Truvia* (Nov. 27, 2012), https://redefinedweightloss.com/the-truth-on-truvia/ (last visited May 12, 2022) ("Erythritol[ is a] sugar alcohol which is made by processing genetically modified corn[.] … Sugar alcohols are notoriously known for their unpleasant side effects. … [B]ecause [sugar alcohols] aren't completely digested, they hang out in our intestines where they are fermented by colonic bacteria.  The by-products of fermentation include gastric distress, diarrhea, cramping, gas and bloating.").

[55] *See supra* n. 43 at 14.

usually derived from GMO corn syrup unless in a certified organic product."[56] On a commercial

scale, maltitol is manufactured by hydrogenating maltose, which is derived from GMO corn starch.

A partially degraded starch is then subjected to enzymatic hydrolysis at high temperatures for

further degradation to maltose-rich products.[57] This ingredient is also included on The Institute

for Responsible Technology's list of GMO ingredients.[58]

> • **Maltitol Syrup.** Maltitol syrup, a hydrogenated starch hydrolysate, is

commercially made from chemical synthesis, typically through the hydrogenation of GMO corn

syrup, a mixture of carbohydrates produced from the hydrolysis of starch.[59] It is a more processed

and concentrated version of maltitol.[60] As a form of maltitol, this ingredient is also included on

---

[56] Myers Detox, *Complete List of Artificial Sweeteners*, https://myersdetox.com/complete-list-of-artificial-sweeteners/ (last visited Oct. 28, 2021)*; see also* realfoodslady Blog at WordPress.com, *A Look at Protein Bars, Particularly IsaLean Bars* (June 3, 2014), https://realfoodslady.wordpress.com/2014/06/03/a-look-at-protein-bars-particularly-isalean-bars/ ("Maltitol – This is one of the many sugar alcohols used to make processed snacks and desserts 'sugar-free'. Consumption of maltitol and other sugar alcohols can cause gastrointestinal discomfort, including a laxative like effect. Maltitol is produced from starch mainly in corn or potatoes. Definitely derived from GM food that is then highly processed into the final product.") (emphasis added)

[57] *See* Chemical Book, "Maltitol," *available at* https://m.chemicalbook.com/ChemicalProductProperty_EN_CB8726683.htm (last visited Oct. 28, 2021); Ariana Saraiva, *Maltitol: Analytical Determination Methods, Applications in the Food Industry, Metabolism and Health Impacts* (Jul. 20, 2020), Int. J. Environ. Res. Public Health 17:5227 at 2 (footnotes omitted), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7400077/ (last accessed May 12, 2022) ("Maltitol is commercially produced from the starch of cereals[.] … Manufacturers resort to D-maltose catalytic hydrogenation to create hydrogenated disaccharide composed of a glucose molecule and a sorbitol molecule that are bonded together.").

[58] *See supra* n. 43 at 14.

[59] Relatedly, several of Defendant's Products also claim to be "free of artificial sweeteners." However, most of these Products contain maltitol syrup. Contrary to Defendant's claims, maltitol syrup is *not* a natural sweetener but rather is "commercially made from chemical synthesis as mentioned above." Thus, both "maltitol and maltitol syrup[] … are always synthetic in origin." Myers Detox, *Complete List of Artificial Sweeteners*, https://myersdetox.com/complete-list-of-artificial-sweeteners/.

[60] *See* realfoodslady Blog at WordPress.com, *A Look at Protein Bars, Particularly IsaLean Bars* (June 3, 2014), *available at* https://realfoodslady.wordpress.com/2014/06/03/a-look-at-protein-

The Institute for Responsible Technology's list of GMO ingredients.[61]

- **Milk Protein Isolate.** Milk protein isolate is the substance obtained by the partial removal of sufficient non-protein constituents (lactose and minerals) from skim milk – derived from cows raised on GMO feed – so that the finished dry product contains 90% or more protein by weight. Milk protein isolate may be produced by filtration, dialysis, or any other process by which all or part of the lactose is removed. As a dairy product, this ingredient is included on The Institute for Responsible Technology's list of GMO Ingredients.[62]

- **Soluble Corn Fiber.** Soluble corn fiber, also referred to as resistant maltodextrin, is a non-digestible fiber made from GMO corn syrup, which is chemically processed. It is produced using enzymatic hydrolysis, a process that involves breaking the chemical bonds of a molecule using enzymes.[63] During this process, it is then heated, hydrolyzed, and filtered into a white tasteless powder. Commercially, soluble corn fiber used in food products to thicken processed foods like protein bars, cereals, baked goods, dairy products, and salad dressings, and as a sweetener in place of sugar.

- **Soy Lecithin.** Soy lecithin, or lecithin, is a processed by-product of the production of soybean oil, which comes from GMO soybean. It is derived from the sludge left

---

bars-particularly-isalean-bars/ ("Maltitol Syrup – Read Maltitol above, then add a more processed and concentrated version of this sweetener, which contains 50-80% maltitol and most of the remainder is composed of sorbitol. Sorbitol is another sugar alcohol that has well-documented cases of stomach upset and diarrhea in some individuals. Perhaps this is why sorbitol has been linked to IBS.").

[61] *See supra* n. 43 at 14.

[62] *See supra* n. 43 at 14.

[63] *See* Healthline, *Is Soluble Corn Fiber Good for You? Benefits and Side Effects* (Mar. 18, 2021), https://www.healthline.com/nutrition/soluble-corn-fiber (last visited Oct. 28, 2021); *see also* Dr. David Friedman's Health Blog, *Are You Eating Soluble Corn Fiber?*, https://doctordavidfriedman.com/blog/are-you-eating-soluble-corn-fiber (last visited Oct. 28, 2021).

after crude oil undergoes a degumming process. More specifically, to produce soybean oil, soybeans are ground into small fragments and then flakes. The flakes are then combined with hexane or another similar solvent. The resulting product is subjected to heat to remove the solvents. Clarified soybean oil is then produced when the gum and water are mechanically separated from the crude soybean oil. The waste sludge or gum left remaining is then dried to produce lecithin. This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[64]

- **Soy Protein.** Soy proteins derive from GMO soybeans and are mainly used as ingredients in formulated foods. Specifically, it is made from soybean meal that has been dehulled and defatted. Dehulled and defatted soybeans are processed into three kinds of high protein commercial products: soy flour, soy protein concentrate (SPC), and soy protein isolate (SPI).[65] As shown below, each of Defendant's Products lists one or both of the latter two forms of GMO soy protein as a primary ingredient. This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[66]

- **Soy Protein Concentrate (SPC).** SPC is about 70% soy protein and is essentially defatted soy flour – derived from GMO soybeans – without water-soluble carbohydrates. It is made by removing part of the carbohydrates (soluble sugars) from dehulled and defatted soybeans. SPC retains most of the fiber of the original soybean. It is widely used as functional or nutritional ingredient in a variety of food products, such as baked foods, breakfast

---

[64] *See supra* n. 43 at 14.
[65] *See* E.W. Lucas, et al., *Soy Protein Products: Processing And Use*, 125 J. Nutr (1995), 573S, *available at* https://pubmed.ncbi.nlm.nih.gov/7884536/; *see also* G N Bookwalter, *Soy Protein Utilization In Food Systems*, 105 Adv Exp Med Biol (1978), 749, *available at* https://pubmed.ncbi.nlm.nih.gov/569429/.

[66] *See supra* n. 43 at 14.

cereals, and in some meat products. As a soy protein, this ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[67]

- **Soy Protein Isolate (SPI).** SPI is protein from GMO soybeans that has been isolated from all the other ingredients in soy via chemical engineering. To do this, the soybeans are first washed with an acid and then neutralized in an alkaline solution. During this process, the soybean is chemically modified, processed, and filled with pesticides. Thus, SPIs "are genetically modified foods."[68] The extraction process often leaves behind residue from chemicals and metals like hexane or aluminum, and it also strips the powder of the zinc and iron typically present in soybean products. At the end of the entire SPI-making process, what remains is a dry powder that is about 90-95% protein and nearly carbohydrate- and fat-free. Additionally, SPI also contains phytates, also called anti-nutrients, which reduce the body's ability to absorb iron and zinc. SPI has been used since 1959 in foods for its functional properties. It is often used in products like protein bars, flour, cereal, and meat and dairy alternatives.[69] This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[70]

- **Sugar.** If not specifically identified on a product label as cane sugar, the sugar is derived from corn or sugar beet, both GM crops. This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[71]

---

[67] *See supra* n. 43 at 14.

[68] Eat This, Not That!, *What is Soy Protein Isolate and Is It Bad For You?* (Jan. 4, 2020), https://www.eatthis.com/soy-protein-isolate/ (last visited Oct. 28, 2021) ("If you have an inflammatory condition or otherwise opt to stay away from GMO's, you probably want to steer clear of SPI.").

[69] *Id.*; *see also* Women's Health, *"Soy Protein Isolate" Is In So. Many. Things. But Is It Healthy?* (May 28, 2019), https://www.womenshealthmag.com/food/a27559289/soy-isolate-protein/ (last visited Oct. 28, 2021).

[70] *See supra* n. 43 at 14.
[71] *See supra* n. 43 at 14.

- **Vegetable Glycerin.** Vegetable glycerin, also known as glycerol or glycerine, can be derived from the refining of biofuels from corn or sugar beet, both GM crops. It is produced commercially the hydrogenolysis of carbohydrates or from petrochemicals. In food products, vegetable glycerin serves as a humectant, solvent, sweetener, and preservative, or as a filler in commercially prepared low-fat foods. Here, the vegetable glycerin contained in a number of think! Products "is derived from plant sources" (*i.e.*, GM crops), and it "is used as a humectant (an ingredient used to preserve the moisture content of the bar) and to help maintain a soft texture in the core of the [Products]."[72] This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[73]

- **Whey.** The byproduct of cheese-producing industries, cheese whey derived from cows raised on GMO feed, is considered as an environmental pollutant due to its high concentrations of biochemical oxygen demand ("BOD") and chemical oxygen demand ("COD"). As demand for milk-derived products is increasing, it leads to increased production of whey, which poses a serious management problem. To overcome this problem, various technological approaches have been employed to convert whey into value-added products. These technological advancements have enhanced whey utilization and about 50% of the total produced whey is now transformed into value-added products including but not limited to whey powder, whey protein, and probiotics. Whey can be biotransformed into proteinaceous feed and food-grade bioprotein/single cell protein through fermentation, directly processed to obtain whey proteins, or

---

[72] Frequently Asked Questions, https://thinkproducts.com/en-us/faqs/ (last visited Oct. 28, 2021).
[73] *See supra* n. 43 at 14.

Case: 1:21-cv-06315 Document #: 28 Filed: 05/16/22 Page 33 of 83 PageID #:276

transformed into bioactive peptides via enzymatic or fermentation processes.[74]  This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[75]

- **Whey Protein.**  Whey protein is made with the protein isolated from the liquid byproduct of cheese derived from cows raised on GMO feed.  Commercially produced whey protein from cow's milk typically comes in four major forms: whey protein isolate (WPI), whey protein concentrate (WPC), whey protein hydrolysate (WPH), and native whey protein.  WPCs are 29–89 percent protein by weight.  WPIs, which are further processed to remove all the fat and lactose, are usually at least 90 percent protein.[76]  This ingredient is also included on The Institute for Responsible Technology's list of GMO ingredients.[77]

45.     Accordingly, Defendant's Non-GMO Claims about its Products are deceptive and misleading to reasonable consumers.

46.     For example, one of Defendant's Products that was purchased by both Plaintiffs, the "think! High Protein Bar, Chunky Peanut Butter," prominently represents that it is a "GMO Free" Product.  However, the Product's primary ingredient, protein blend, is a GMO-derived ingredient composed of soy protein isolate (derived from GMO soy), as well as calcium caseinate and whey protein isolate (animal-derived inputs sourced from cows raised on GMO feed).  The Product also contains several other genetically modified ingredients, including maltitol syrup, vegetable glycerin, lecithin, and milk fat:

---

[74] Jay Shankar Singh Yadav, *Cheese whey: A potential resource to transform into bioprotein, functional/nutritional proteins and bioactive peptides*, 33:6(1) Biotechnol. Adv. (2015), 756, https://www.sciencedirect.com/science/article/abs/pii/S073497501530015X.

[75] *See supra* n. 43 at 14.

[76] WPI goes through the same initial processing as WPC; however, to isolate the protein to higher concentrations than typical WPC, WPI is sent through additional filtering loops, which further removes lactose, fat, and undesired minerals.

[77] *See supra* n. 43 at 14.



# Chunky Peanut Butter

| Nutrition Facts | Amount/serving | % Daily Value** | Amount/serving | % Daily Value** |
|---|---|---|---|---|
| Serving size 1 Bar (60g) | **Total Fat** 10g | **13%** | **Total Carb** 23g | **8%** |
| | Sat Fat 3g | **15%** | Dietary Fiber 1g | **4%** |
| | *Trans* Fat 0g | | Total Sugars 0g | |
| Calories per serving **240** | **Cholesterol** 0mg | **0%** | Incl 0g Added Sugars | **0%** |
| | **Sodium** 220mg | **8%** | Sugar Alcohol 10g | |
| **Percent DV are based on a 2,000 calorie diet. | | | **Protein** 20g | **40%** |

Vit D 0mcg 0% · Calcium 120mg 10% · Iron 1.5mg 8% · Potassium 130mg 2%

**INGREDIENTS:** PROTEIN BLEND (SOY PROTEIN ISOLATE, CALCIUM CASEINATE, WHEY PROTEIN ISOLATE), MALTITOL SYRUP, VEGETABLE GLYCERIN, PEANUTS, WATER, COCOA BUTTER, SUNFLOWER OIL, CHOCOLATE, PEANUT FLOUR, PEANUT OIL, LECITHIN, SODIUM CASEINATE, SALT, TAPIOCA STARCH, MILK FAT, NATURAL FLAVOR.

**CONTAINS: PEANUT, MILK, AND SOY.**

MADE IN A FACILITY THAT PROCESSES TREE NUTS AND EGG.



GMO FREE*  Gluten FREE  Low GI  NO Artificial Sweeteners*

34

47.     Similarly, "think! High Protein Lemon Delight Bar" prominently represents that it is a "GMO Free" Product.   However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, whey protein concentrate, maltitol syrup, vegetable glycerin, lecithin,  and citric acid:







48.     Defendant's "think! High Protein Brownie Crunch Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate[78], whey protein isolate, calcium caseinate, whey protein concentrate, maltitol syrup, vegetable glycerin, lecithin, and milk fat:



---

[78] *See* realfoodslady Blog at WordPress.com, *Think Thin Bars…think again* (Aug. 1, 2014), https://realfoodslady.wordpress.com/tag/non-gmo/ ("Let's have a look at the Brownie Crunch Think Thin protein bar. … You can find the ingredients listed on a bar.  The protein comes from soy.  Overly processed, most likely genetically modified soy.  You will actually find the word 'soy' listed in the ingredients 4 times! … Please read this closely because the brownie crunch **bar does contain genetically modified ingredients**.  You will notice the company has listed they strive to source Non-GMO ingredients and only their Crunch Mixed Nut Bars do not contain genetically modified ingredients!  Ha!  They rely on us consumers being too busy and rushed to read the fine print.") (emphasis in original).

49.     The "think! High Protein Creamy Peanut Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, calcium caseinate, whey protein isolate, maltitol syrup, vegetable glycerin, lecithin, and milk fat:







50. The "think! High Protein Cookies and Crème Bar" prominently represents that it is a "GMO Free" Product. However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, whey protein concentrate, maltitol syrup, vegetable glycerin, and lecithin:





    

51.     The "think! High Protein Berries & Crème Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, calcium caseinate, whey protein isolate, whey protein concentrate, vegetable glycerin, maltitol syrup, lecithin, and citric acid:





c

52.     The "think! High Protein Chocolate & Crème Cupcake Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, milk protein concentrate, whey protein concentrate, maltitol syrup, soluble corn fiber, vegetable glycerin, and lecithin:





53.     The "think! High Protein Chocolate Fudge Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, maltitol syrup, vegetable glycerin, lecithin, and milk fat:







54. The "think! High Protein Coconut Cake Bar" prominently represents that it is a "GMO Free" Product. However, the Product contains several genetically modified ingredients, including soy protein isolate, calcium caseinate, whey protein isolate, whey protein concentrate, vegetable glycerin, maltitol syrup, and lecithin:



## Coconut Cake

| Nutrition Facts | Amount/serving | % DV** | Amount/serving | % DV** |
|---|---|---|---|---|
| Serving size 1 Bar (60g) | Total Fat 8g | 10% | Total Carb 23g | 8% |
| | Sat Fat 6g | 30% | Dietary Fiber 0g | 0% |
| | Trans Fat 0g | | Total Sugars 3g | |
| Calories per serving 230 | Cholesterol <5mg | 2% | Incl 3g Added Sugars | 6% |
| | Sodium 180mg | 8% | Sugar Alcohol 7g | |
| **Percent DV are based on a 2,000 calorie diet. | | | Protein 20g | 40% |

Vit D 0mcg 0% · Calcium 130mg 10% · Iron 1.3mg 8% · Potassium 90mg 2%

**INGREDIENTS:** PROTEIN BLEND (SOY PROTEIN ISOLATE, CALCIUM CASEINATE, WHEY PROTEIN ISOLATE, WHEY PROTEIN CONCENTRATE), VEGETABLE GLYCERIN, BROWN RICE SYRUP, MALTITOL SYRUP, WATER, PALM KERNEL OIL, SHREDDED COCONUT, CASHEW BUTTER, COCONUT OIL, LECITHIN, NATURAL FLAVOR, SALT, MONK FRUIT EXTRACT.
**CONTAINS: TREE NUTS (COCONUT, CASHEW), MILK, AND SOY.**
MANUFACTURED IN A FACILITY THAT PROCESSES OTHER TREE NUTS, PEANUT AND EGG.








42

55.     The "think! High Protein White Chocolate Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, whey protein concentrate, maltitol syrup, vegetable glycerin, and lecithin:







56. The "think! Protein+ 150 Calorie Chocolate Almond Brownie Bar" prominently represents that it is a "GMO Free" Product. However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, vegetable glycerin, sugar, nonfat dry milk, and lecithin:







57.    The "think! Protein+ 150 Calorie Salted Caramel Bar" prominently represents that it is a "GMO Free" Product.   However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, vegetable glycerin, sugar, nonfat dry milk, and lecithin:



45

58.    The "think! Protein+ 150 Calorie S'mores Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, vegetable glycerin, sugar, nonfat dry milk, and lecithin:







59.     The "think! Protein+ 150 Calorie Cupcake Batter Bar" prominently represents that it is a "GMO Free" Product.   However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, vegetable glycerin, sugar, cultured nonfat dry milk, and lecithin:







60.     The "think! Protein+ 150 Calorie Chunky Chocolate Peanut Bar" prominently represents that it is a "GMO Free" Product. However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, vegetable glycerin, sugar, nonfat dry milk, and lecithin:









61. The "think! Protein+ 150 Calorie Chocolate Chip Bar" prominently represents that it is a "GMO Free" Product. However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, vegetable glycerin, sugar, soy lecithin, milk, lecithin, and brown sugar:





62.     The "think! Keto Protein Chocolate Peanut Butter Pie Bar" prominently represents that it is prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including erythritol, whey protein isolate, milk, milk protein isolate, butterfat, and soy lecithin:









63.     The packaging of Defendant's "think! thinkKIDS Chocolate Chip Protein Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, sugar, milk, soy lecithin, vegetable glycerol, cocoa soy crisp, brown sugar, and lecithin:



64.     The packaging of Defendant's "think! thinkKIDS Peanut Butter Cup Protein Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, sugar, milk, soy lecithin, vegetable glycerol, brown sugar, soy protein crisp, and lecithin:



65.     The packaging of Defendant's "think! thinkKIDS Cookies & Crème Protein Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, nonfat dry milk, whole milk, soy lecithin, vegetable glycerol, soy crisp, brown sugar, and lecithin:



66.     The packaging of Defendant's "think! thinkKIDS Protein Vanilla Cupcake Bar" prominently represents that it is a "GMO Free" Product.  However, the Product contains several genetically modified ingredients, including soy protein isolate, whey protein isolate, calcium caseinate, nonfat dry milk, cultured whey protein concentrate, cultured skim milk, soy lecithin, vegetable glycerol, and lecithin:



67. The presence of genetically modified ingredients in the Products renders Defendant's descriptions of "non-GMO" false and misleading under an objective reasonable consumer standard.

## RULE 9(B) ALLEGATIONS

68. Federal Rules of Civil Procedure, Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

69. WHO: Defendant made material misrepresentations and omissions of fact in the labeling, packaging, and marketing of the Products.

70. WHAT: Defendant made material misrepresentations and omissions of fact by using the terms "GMO Free" in the labeling, packaging, and marketing of the Products. Defendant made these claims with respect to the Products even though the Products did not meet the requirements to make such claims. Defendant's misrepresentations and omissions were material because a reasonable consumer would not have purchased or paid as much for the Products if he or she knew that they contained false representations.

71. WHEN: Defendant made the material misrepresentations and omissions detailed herein continuously throughout the Class Period.

72. WHERE: Defendant's material misrepresentations and omissions were made, inter alia, on the labeling and packaging of the Products, on Defendant's website at http://www.thinkproducts.com, on the websites of authorized third-party retailers of the Products,

on in-store signage at brick-and-mortar locations of authorized third-party retailers of the Products, and through Defendant's various other advertisements.

73.     HOW:  Defendant made written misrepresentations and failed to disclose material facts on the labeling and packaging of the Products and on its website and other advertising.

74.     WHY:  Defendant engaged in the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiffs and other reasonable consumers to purchase and/or pay a premium for Products based on the belief that they were "GMO Free." Defendant profited by selling the Products to millions of unsuspecting consumes nationwide.

## CLASS ALLEGATIONS

75.     ***Class Definition.***  Plaintiffs bring this action on behalf of a class of similarly situated individuals, defined as all persons in the United States who, who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the think! Products at issue (the "Class").

(a)     ***California Subclass.***  Plaintiff Mary Bergen also seeks to represent a subclass of all Class members who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the think! Products at issue in California (the "California Subclass").

(b)     ***New York Subclass.***  Plaintiff Andrew Mercatante also seeks to represent a subclass of all Class members who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the think! Products at issue in New York (the "New York Subclass").

76.     Excluded from the Class and Subclasses are persons who made such purchase for purpose of resale, Defendant and any entities in which Defendant has a controlling interest,

Defendant's agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

77.     Plaintiffs reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

78.     ***Numerosity.***     Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the millions.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

79.     ***Commonality and Predominance.***     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include but are not limited to: whether Defendant warranted the Products as "GMO Free"; whether the Products contain genetically modified organisms; whether Defendant breached these warranties; and whether Defendant committed the statutory and common law violations alleged against them herein by doing so.

80.     ***Typicality.***     The claims of the named Plaintiffs are typical of the claims of the Class in that Plaintiffs purchased one of Defendant's Products in reliance on the representations and warranties described above and suffered a loss as a result of that purchase.

81.     ***Adequacy.***     Plaintiffs are adequate representatives of the Class and respective Subclasses because their interests do not conflict with the interests of the Class and Subclass members they seek to represent, they have retained competent counsel experienced in prosecuting

class actions, and they intend to prosecute this action vigorously. The interests of the Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

82. **Superiority**. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

83. Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

84. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Class and Subclasses and will likely retain the benefits of its wrongdoing.

85. Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of California's Unfair Competition Law ("UCL"),
### California Business & Professions Code §§ 17200, *et seq.*
### (On Behalf Of The California Subclass)

86.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

87.     Plaintiff Bergman brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

88.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising[.]"

89.     Defendant's misrepresentations and other conduct, described herein, violated the "unlawful" prong of the UCL by violating the CLRA as described herein, the FAL as described herein, and Cal. Com. Code § 2607.

90.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

91.     Defendant violated the "fraudulent" prong of the UCL by making misrepresentations about the Products at issue that were untrue and misleading, as described herein.

92.     Plaintiff Bergman and the California Subclass lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased the Products on the same

terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

93.     Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

94.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Products are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

## COUNT II
### Violation Of California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, *et seq*. (On Behalf Of The California Subclass)

95.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

96.     Plaintiff Bergman brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

97.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

98.     Defendant committed acts of false advertising, as defined by § 17500, by misrepresenting that the Products are "GMO Free" products, when in fact they are not.

99.     Defendant knew or should have known, through the exercise of reasonable care, that its Non-GMO Claims about the Products were untrue and misleading.

100.    Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

101.    Plaintiff Bergman and the California Subclass lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

102.    Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product,

Plaintiff would be left without the parity in purchasing power to which she is entitled. Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

**COUNT III**
**Violation Of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq*.**
**(On Behalf Of The California Subclass)**

103.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

104.    Plaintiff Bergman brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

105.    Plaintiff Bergman and members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiffs and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

106.    Defendant's Products are "goods" within the meaning of Cal. Civil Code § 1761(a). The purchases by Plaintiffs and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

107.    The acts and practices of Defendant as described above were intended to deceive Plaintiffs and the Class as described herein, and have resulted, and will continue to result, in damages to Plaintiffs and members of the Class. These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations deceiving that the Products have characteristics, uses, and/or benefits, which they do not have, in violation of Cal. Civil Code § 1770(a)(5); (b) Defendant's acts and practices

constitute representations that the Products are of a particular standard, quality, or grade, when in fact they are of another, in violation of Cal. Civil Code § 1770(a)(7); and (c) Defendant's acts and practices constitute the advertisement of the Products in question with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

108.     Defendant violated these provisions of the CLRA by misrepresenting that the Products are "GMO Free" products, when in fact they are not.

109.     Defendant knew or should have known, through the exercise of reasonable care, that its Non-GMO Claims about the Products were untrue and misleading.

110.     Plaintiff Bergman and the California Subclass suffered injuries caused by Defendant's CLRA violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

111.     Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

112.     Plaintiff Bergman, on behalf of herself and all other members the California Subclass, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

113.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Products are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

114.     In compliance with the provisions of California Civil Code § 1782, Plaintiffs sent written notice to Defendant prior to filing this action on August 31, 2021, informing Defendant of their intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return request, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated."  Accordingly, Plaintiff Bergman, individually and on behalf of the proposed California Subclass, seeks monetary damages from Defendant as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

## COUNT IV
**Violation Of New York's General Business Law § 349**
**(On Behalf Of The New York Subclass)**

115.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

116.    Plaintiff Mercatante brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

117.    New York's General Business Law § 349 ("GBL § 349") prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

118.    GBL § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring … an action to recover his actual damages or fifty dollars, whichever is greater."  GBL § 349(h) further provides that "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section," and that "[t]he court may award reasonable attorney's fees to a prevailing plaintiff."

119.    Defendant's design, manufacture, distribution, marketing, advertising, labeling, and sale of the Products throughout the New York constitutes "business, trade or commerce" under GBL § 349(a).

120.    Plaintiff Mercatante and members of the Subclass are consumers who purchased products from Defendant for their personal use.

121.    Defendant's conduct violates GBL § 349 because Defendant engaged in the deceptive acts and practices described above, which included marketing messages directed at Plaintiff and the Subclass Members, conveying, on the labeling and packaging for the Products and elsewhere the Misrepresentations that the Products are "GMO Free," when in fact they contain several GMO ingredients.

122.    Defendant's marketing and sale of the Products omitted material facts concerning the health benefits associated with the use of the Products.  Defendant also misrepresented facts and made misleading statements and omissions concerning the fitness of the Products for providing

non-GMO ingredients. These representations were deceptive, false, and misleading given the fact that the Products do contain several ingredients derived from genetically modified organisms. Defendant's conduct as described herein is inherently deceptive and materially misleading, and the Non-GMO Claims were known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendant.

123.    Defendant's materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff Mercatante and members of the New York Subclass.

124.    Defendant's actions impact the public interest because Plaintiff Mercatante and the New York Subclass have been injured in exactly the same way as millions of other consumers by Defendant's deceptive acts and practices as described herein.

125.    Defendant's acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff Mercatante and members of the New York Subclass.

126.    Defendant's misrepresentations, misleading statements, and omissions were material to Plaintiff Mercatante and members of the Class.

127.    Defendant's violation of GBL § 349 was willful and knowing. As described above, at all relevant times, Defendant knew that their Products contain ingredients derived from GMOs and therefore were not "GMO Free" within the natural meaning reasonable consumers would apply that term, as influenced by, among other things, the guidance of the Non-GMO Project, a mission-driven nonprofit organization dedicated to building and protecting a non-GMO food supply. Nonetheless, Defendant, through its misrepresentations, misleading statements, and omissions

related to the Non-GMO Claims, as detailed above, continued to sell the Products to New York residents to increase their own profits, all the while bilking consumers out of millions of dollars.

128.    Plaintiff Mercatante and members of the New York Subclass suffered injuries as a direct result of Defendant's violations of GBL § 349 because: (a) they would not have purchased the think! Products on the same terms if the true facts were known about the product; (b) they paid a price premium for think! Products bearing a Non-GMO Claim; and (c) the think! Products do not have the characteristics as promised by Defendant.

129.    Had Plaintiff Mercatante and the members of the New York Subclass known of Defendant's deceptive acts and practices, including the misrepresentations, misleading statements, and omissions about the Products (*i.e.*, the Non-GMO Claims), they would not have purchased the Products or would not have purchased them on the same terms.

130.    As a result of its unfair, unconscionable and/or deceptive acts and practices, Defendant was able to charge more money for products bearing Non-GMO label claim than it would be able to charge for identical products that do not purport to be "GMO Free."

131.    Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled. Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

132.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Products are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

133.     As a direct and proximate result of Defendant's conduct in violation of GBL § 349, Plaintiff Mercatante and the members of the New York Subclass have been injured in an amount to be proven at trial, with a statutory minimum of fifty dollars per Class member.

134.     Because Defendant's violation was knowing and willful, Plaintiff Mercatante and the members of the New York Subclass are entitled to treble damages under GBL § 349(h).

135.     Plaintiff Mercatante also seeks injunctive relief, including a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products and the implementation of a corrective advertising campaign by Defendant.

136.     Additionally, pursuant to GBL § 349, Plaintiff Mercatante and Subclass Members will seek attorneys' fees and costs.

**<u>COUNT V</u>**
**Violation Of New York's General Business Law § 350**
**(On Behalf Of The New York Subclass)**

137.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

138.     Plaintiff Mercatante brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

139.    New York's General Business Law § 350 ("GBL § 350") prohibits false advertising in the conduct of any business, trade, or commerce.

140.    Pursuant to GBL § 350, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

141.    Defendant's labeling of the Products promised that they were "GMO Free," among other Misrepresentations.  A reasonable consumer would understand this to mean that the Products are 100% free of ingredients derived from GM crops or food sources, genetically engineered in a laboratory setting through the use of biotechnologies, or sourced from animals that were raised on GMO feed.  However, the Products do, in fact, contain several ingredients derived from GM crops and animals raised on GMO feed, and therefore are not "GMO Free" as the labeling and packaging purports.

142.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising, in violation of GBL § 350.

143.    Defendant's false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

144.    Defendant's false, misleading, and deceptive statements and representations of facts have resulted in consumer injury or harm to the public interest.

145.    As a direct result of Defendant's false, misleading, and deceptive statements and representations of fact, Plaintiff Mercantante and members of the New York Subclass have suffered, and continue to suffer, economic injury.

146.    Plaintiff Mercantante and New York Subclass Members have suffered damages as a direct result of Defendant's violations of GBL § 350 because: (a) they would not have purchased

69

the Products on the same terms if they had known that the Non-GMO were not true; (b) they paid a price premium for the Products; and (c) the Products do not have the characteristics, use, benefits, or quantities as promised by Defendant.

147.  Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

148.  Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Products are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

149.  On behalf of himself and other members of the New York Subclass, Plaintiff Mercatante seeks to recover his actual damages or five hundred dollars (whichever is greater), three times actual damages, and reasonable attorneys' fees.

## COUNT VI
### Breach Of Express Warranty
### (On Behalf Of The Nationwide Class And Subclasses)

150.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

151.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant under the laws of their place of purchase.

152.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the think! Products at issue, expressly warranted that the Products as "GMO Free," among other Misrepresentations.

153.    In fact, the Products are not "GMO Free" as Defendant claims, because they contain several ingredients derived from GMOs, and thus are not as marketed, advertised, and/or warranted.

154.    As a result of Defendant's false and/or misleading misrepresentations, including that the Products are "GMO Free," the Products were defective and did not adhere to the express warranty when first sold to Plaintiffs and Class Members, and have not been repaired, replaced, or otherwise remedied as originally warranted since the time of sale.

155.    By breaching its express warranty, Defendant has caused and continues to cause these warranties to fail of their essential purpose.

156.    Plaintiffs and Class Members have been injured and harmed as a direct and proximate cause of Defendant's breach of express warranty because: (a) they would not have purchased the Products on the same terms if the true facts had been known at the point of purchase; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the purportedly "GMO Free" Products do not have the characteristics, uses,

or benefits as promised by Defendant because they contain several ingredients derived from GMOs.

157.    Plaintiff, individually and on behalf of the Class and Subclasses, seek all damages permitted by law, including compensation for the monetary difference between the Products as warranted and as sold, along with all other incidental and consequential damages, statutory damages, attorney's fees, and all other relief allowed by law.

**COUNT VII**
**Breach Of The Implied Warranty Of Merchantability**
**(On Behalf Of The Nationwide Class And Subclasses)**

158.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

159.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant under the laws of their place of purchase.

160.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that the Products are "GMO Free" when in fact they are not, among other Misrepresentations.

161.    Defendant breached the warranty implied in the contract for the sale of the Products because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, the goods were not fit for the ordinary purposes for which such goods are used, and the goods do not conform to the promises or affirmations of fact made on the label.  As a result, Plaintiffs and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

162.    Plaintiffs and Class Members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

163.     The Products were not altered by Plaintiffs or Class Members.

164.     The Products were defective when they left the exclusive control of Defendant.

165.     Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

166.     As a result of Defendant's false and/or misleading representation that the Products are "GMO Free" (among other Misrepresentations), the Products were defectively designed and unfit for their intended purpose, and Plaintiffs and Class Members did not receive the goods as warranted.

167.     Plaintiffs and Class Members have been injured and harmed as a direct and proximate cause of Defendant's breach of implied warranty because: (a) they would not have purchased the Products on the same terms if the true facts were known about the Products at the point of purchase; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

<u>**COUNT VIII**</u>
**Unjust Enrichment / Restitution**
**(On Behalf Of The Nationwide Class And Subclasses)**

168.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

169.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant under the laws of their place of purchase.

170.     To the extent the Court determines it is necessary to do so, this claim is pled in the alternative to the other legal claims alleged in the complaint.

171. Plaintiffs and Class Members conferred benefits on Defendant by purchasing the purportedly "GMO Free" Products. Defendant was and should have been reasonably expected to provide Products that conform with the qualities listed on their labeling and packaging.

172. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Products are "GMO Free" products (among other Misrepresentations) at the time of sale. These Non-GMO Misrepresentations caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts were known.

173. Defendant unjustly profited from the sale of the Products at inflated prices as a result of its false representations, omissions, and concealment of the true qualities of the Products. Defendant benefited at Plaintiffs' and Class Members' expenses when it sold GMO-riddled Products that were inferior to the purportedly "GMO Free" Products that Plaintiffs and Class Members thought they were actually purchasing, yet the price they paid was the price for a "GMO Free" Products that are 100% free of ingredients derived from GM crops or food sources, genetically engineered in a laboratory setting through the use of biotechnologies, or sourced from animals that have been raised on GMO feed.

174. As a proximate result of Defendant's false representations, omissions, and/or concealment of the true qualities of the Products, and as a result of Defendant's resulting ill-gotten gains, benefits, and profits, Defendant has been unjustly enriched at the expense of Plaintiffs and Class Members. It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiffs and Class Members.

175.    There is a direct relationship between Defendant on the one hand, and Plaintiffs and Class Members on the other, sufficient to support a claim for unjust enrichment.  Defendant marketed and sold the Products with the false and misleading Misrepresentations that they were "GMO Free" on their labeling and packaging to improve retail sales, which in turn improved wholesale sales.  Conversely, Defendant knew that disclosure of the true and GMO-riddled nature of the Products would suppress retail and wholesale sales of the Products, in turn suppressing the demand for the Products, and would negatively impact the reputation of Defendant's brand among Class Members and consumers.

176.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Plaintiffs and Class Members are entitled to restitution for their unjust enrichment in the amount of Defendant's ill-gotten gains, benefits, and profits, including interest thereon.  Accordingly, Plaintiffs seek, individually and on behalf of Class and Subclass Members, an order requiring Defendant to disgorge its gains and profits to Plaintiffs and members of the Classes, together with interest, in a manner to be determined by the Court.

177.    Accordingly, Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

178.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure that the Products are not in fact Non-GMO; or (2) the removal of such representations, will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

**COUNT IX**
**Negligent Misrepresentation**
**(On Behalf Of The Nationwide Class And Subclasses)**

179.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

180.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant under the laws of their place of purchase.

181.    As discussed above, Defendant misrepresented that the Products are "GMO Free" (among other misrepresentations), notwithstanding the fact that the Products do contain several ingredients derived from GMOs and are therefore not, in fact, "GMO Free" as their labeling and packaging prominently states.

182.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.  At an absolute minimum, Defendant negligently misrepresented as "GMO Free" and/or negligently omitted material facts about the think! Products at issue, namely that the Products do, in fact, contain GMOs.

183.    Defendant had no reasonable grounds for believing that its representations were true because Defendant failed to consistently ensure that it was able to produce the Products as free of GMOs, as advertised.

184.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually did induce, Plaintiffs and Class Members to purchase the Products.  In making these negligent misrepresentations and omissions to Plaintiffs and the Class, upon which Plaintiffs and Class Members reasonably and justifiably relied, Defendant intended to induce, and actually did induce, Plaintiffs and Class Members to purchase its "GMO-Free" Products.

185.    At all times herein, Plaintiffs and Class Members were unaware of the falsity of Defendant's statements.

186.    Plaintiffs and Class Members reasonably acted in response to the statements made by Defendant when they purchased the Products.

187.    As a direct and proximate result of Defendant's negligent misrepresentations and omissions regarding the true nature of the Products, Plaintiffs and Class Members were injured. Specifically, Plaintiffs and Class Members incurred economic harm as a result of Defendant's negligent misrepresentations and/or omissions in that they would not have purchased the Products or would not have purchased them on the same terms, but for Defendant's unlawful conduct alleged herein.  Accordingly, Plaintiffs and Class Members are entitled to compensatory and/or punitive damages in an amount to be proven at trial.

**COUNT X**
**Fraud**
**(On Behalf Of The Nationwide Class And Subclasses)**

188.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding

paragraphs of this complaint.

189.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant under the laws of their place of purchase.

190.     As discussed above, Defendant provided Plaintiffs and Class Members with false or misleading material information and failed to disclose material facts about the Products, including but not limited to the fact that each of the purportedly "GMO Free" Products do indeed contain several ingredients derived from GMOs and are therefore not, in fact, "GMO Free" as their labeling and packaging prominently states.  These misrepresentations and omissions were made with knowledge of their falsehood.

191.     These misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class Members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and Class members to purchase the Products.

192.     The fraudulent actions of Defendant caused damage to Plaintiffs and Class and Subclass Members, who are entitled to damages and other legal and equitable relief as a result.

193.     Further, as a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT XI
### Fraudulent Misrepresentation
### (On Behalf Of The Nationwide Class And Subclasses)

194.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

195.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant under the laws of their place of purchase.

196.    At all relevant times, Defendant was engaged in the business of manufacturing, marketing, packaging, distributing, and selling the Products.

197.    Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

198.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the true nature, quality, and characteristics of the Products, namely pertaining to the "GMO-free" representation.

199.    Rather than inform consumers of the truth regarding the GMOs in the Products, Defendant misrepresented the Products as "GMO-free" at the time of purchase.

200.    Defendant made these material misrepresentations to boost or to maintain sales of the Products, and to falsely assure purchasers that it is a company that cares about GMOs in foods, as discussed throughout.   The false representations were material to consumers, including Plaintiffs, because the representations played a significant role in the decision to purchase the Products.

201.    Plaintiffs and Class members accepted the terms in purchasing the Products, which were silent on the true quality, nature, and characteristics of the Products.  Plaintiffs and Class members had no reasonable way of knowing of Defendant's misrepresentation as to the Products, and had no way of knowing that the misrepresentations were misleading.

202.    Although Defendant had a duty, arising, in part, from its superior knowledge, to ensure that accuracy of the information regarding whether its ingredients were in fact genetically modified, it did not fulfill these duties.

203.    Instead, Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales were essential for its continued growth and to maintain and

grow its reputation as a producer of Non-GMO foods. Such benefits came at the expense of Plaintiffs and Class members.

204. Plaintiffs and Class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth. Plaintiffs' and Class members' actions were justified given Defendant's misrepresentations. Defendant was in the exclusive control of material facts, and such facts were not known to the public.

205. Due to Defendant's misrepresentations, Plaintiffs and Class members sustained injury due to the purchase of Products that did not live up to their advertised and packaged representations, especially those concerning the GMO-free representations. Plaintiffs and Class members are entitled to recover full or partial refunds for Products they purchased due to Defendant's misrepresentations, or they are entitled to damages for the diminished value of their Products, amounts to be determined at trial.

206. Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class member's rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's products, and to boost its reputation as a maker of Non-GMO foods. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek

judgment against Defendant, as follows:

(a)   For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class, Plaintiff Bergman as representative of the California Subclass, Plaintiff Mercatante as representative of the New York Subclass, and Plaintiffs' attorneys as Class Counsel to represent the proposed Class and Subclasses;

(b)   For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiffs, the Class, and the Subclasses on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For an order awarding Plaintiffs and members of the Class and Subclasses their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

(i)   For such other and further relief as the Court may deem proper.

Dated: May 16, 2022                Respectfully submitted,

By:   <u> /s/ Carl V. Malmstrom   </u>
          Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W. Jackson St., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Fax: (212) 686-0114
Email:  malmstrom@whafh.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*Pro Hac Vice Forthcoming*)
Sean L. Litteral (*Pro Hac Vice Forthcoming*)
Julia K. Venditti (*Pro Hac Vice Forthcoming*)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com
       slitteral@bursor.com
       jvenditti@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

## <u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>

I, Carl V. Malmstrom, declare as follows:

1.      I am an attorney at law licensed to practice in the State of Illinois and a member of the bar of this Court.  I am Of Counsel at Wolf Haldenstein Adler Freeman & Herz LLC, counsel of record for Plaintiffs Mary Bergman and Andrew Mercatante.  Plaintiff Bergman resides in Scotts Valley, California, and Plaintiff Andrew Mercatante resides in Pleasantville, New York.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of Illinois.  Additionally, Defendant maintains its principal place of business in this District and Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiffs from this District.

I declare under the penalty of perjury under the laws of the State of Illinois and the United States that the foregoing is true and correct and that this declaration was executed at Chicago, Illinois, this 16th day of May, 2022.


     */s/ Carl V. Malmstrom*
                Carl V. Malmstrom